IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

**FILED**
JUL 2 7 2012
JULIE A. RICHARDS, CLERK
US DISTRICT COURT, EDNC
BY___ DEP CLK

United States, *ex rel.* RICKEY HOWARD,
BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF
AMERICA,

Plaintiff,

v.

HARPER CONSTRUCTION
COMPANY, INC., a California
Corporation; FRAZIER MASONRY
CORPORATION, a California
Corporation; F-Y, INC., a California
Corporation; ABC CORPORATIONS 1
through 10; RUSSELL FRAZIER; and
ROBERT A. YOWELL,

Defendants.

Case No.: **7:12-CR-215-D**

**COMPLAINT and JURY DEMAND**

*ORIGINAL COMPLAINT FILED IN*
*CAMERA AND UNDER SEAL, PURSUANT*
*TO 31 U.S.C. §3730(b)(2)*

*\*\*DO NOT PLACE IN PRESS BOX\*\**
*\*\*DO NOT ENTER ON PACER\*\**

## ORIGINAL COMPLAINT OF RELATOR RICKEY HOWARD

## **TABLE OF CONTENTS**

**Page**

I. Parties...................................................................................................................... 1

II. Respondeat Superior and Vicarious Liability……………………………………………..3

III. Background on Government Contracting ............................................................................ 3

 A. Federal Contracting Process for Construction Projects……………………………....3

 B. Small Business Concerns……………………………………………………………5

IV. Factual Allegations ............................................................................................................ 10

 A. Overview of Defendants ........................................................................................ 10

 B. Defendants' Fraudulent Scheme to Create Sham Businesses to Garner
  Government Contracting Work.............................................................................. 11

  1. Courthouse Bay Project ............................................................................ 12

   a. Scope of Courthouse Bay Project .................................................. 13

   b. Harper Construction awards subcontract to Frazier & then F-Y .. 14

  2. Defendants' Fraudulent Conduct is Widespread…………………………24

IV. Actionable Conduct by Defendants Under the False Claims Act.......................... 24

 A. The False Claims Act.............................................................................................. 25

 B. Defendants Submitted False and/or Fraudulent Claims for Payment
  to the Federal Government and/or Caused Entities to Submit False and/or
  Fraudulent Claims for Payment .............................................................................. 27

 C. Defendants Made, Used, or Caused to be Made or Used False Records and/or
  Statements to Receive Payment.............................................................................. 29

 D. Defendants Conspired to Commit Violations of the False Claims Act ................ 30

 E. Defendants Failed to Disclose Their Obligation to Repay the Federal Government
  in Violation of the Reverse False Claims Provisions of the False Claims Act..... 30

First Claim for Relief (False Claims– 31 U.S.C. §3729(a)(1)(A)) ................................................ 31

i

Second Claim for Relief (False Statements– 31 U.S.C. §3729(a)(1)(B)) ...................................... 31

Third Claim for Relief (Civil Conspiracy to Commit Violiations of the False Claims Act–
31 U.S.C. §3729(a)(1)(C)) .................................................................................................... 32

Fourth Claim for Relief (Reverse False Claims– 31 U.S.C. §3729(a)(1)(G)) ............................... 33

Fifth Claim for Relief (Violation of the Anti-Kickback Act, 41 U.S.C. § 53) ............................. 34

Prayer for Relief..................................................................................................................35

NOW COMES PLAINTIFF-RELATOR, Rickey Howard, by and through his attorneys,

Charles H. Rabon, Jr. of Rabon Law Firm, PLLC, Joel M. Androphy of Berg & Androphy, and

Matt Abbott, of Abbott Law Firm, LLC, on behalf of the United States of America, and brings

this action under 31 U.S.C. §§ 3729-3732 (the "False Claims Act") to recover all damages,

penalties and other remedies established by the False Claims Act on behalf of the United States

and himself and shows the Court as follows:

## I. PARTIES

1. Plaintiff-Relator Rickey Howard ("Howard") is a resident of Craven County, North
   Carolina.

2. Defendant Harper Construction Company, Inc. ("Harper") is a California corporation
   with its corporate headquarters in San Diego, California. Harper may be served with
   process through its Registered Agent, Edward C. Muns, at 2241 Kettner Boulevard, Suite
   200, San Diego, California 92101.

3. Defendant Frazier Masonry Corporation ("Frazier Masonry") is a California corporation
   with its corporate headquarters in Camarillo, California. Frazier Masonry may be served
   with process through its Registered Agent, Patrick Delaney, at 42306 10th Street West,
   Suite C, Lancaster, California 93534.

4. Defendant F-Y, Inc. ("F-Y") is a California company with its corporate headquarters in
   Carlsbad, California. F-Y may be served with process through its Registered Agent,
   Robert A. Yowell, at 1682 Marbella Drive, Vista, California 92081.

5. Defendants ABC Corporations 1 through 10 ("ABC Corporations"), are fictitiously
   named corporations, to be made more specific during discovery.

6. Defendant Russell Frazier is a resident of the State of California. Russell Frazier may be

1

served with process at his business address, which is 400 W. Ventura Boulevard, Suite 200, Camarillo, California 93010.

7. Defendant Robert A. Yowell is a resident of the State of California. He may be served with process at his residence address, which is 1682 Marbella Drive, Vista, California 92081.

## II. JURISDICTION AND VENUE

8. This action arises under the False Claims Act, 31 U.S.C. §3729, *et seq*.

9. Jurisdiction over this action is conferred upon this Court by 31 U.S.C. §3732(a) and 28 U.S.C. §3130 in that this action arises under the laws of the United States.

10. Venue is proper in this district pursuant to 31 U.S.C. §3732(a), which provides that "any action under §3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by §3729 occurred." A substantial part of the proscribed acts, which are the subject of this action, occurred in the State of North Carolina within this judicial district. At all times material hereto, corporate defendants Harper Construction, Frazier Masonry, and F-Y regularly conducted business within the State of North Carolina, within this judicial district. Additionally, venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2).

11. There are no bars to recovery under 31 U.S.C. § 3730(e). Specifically, this suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media, and, or in the alternative, Relator Howard is an original source as defined therein. Relator

2

Howard has direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. As required pursuant to 31 U.S.C. §§3730(b) and (e), Relator Howard has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) of all material evidence, information and documents related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the United States and the United States Attorney for the Eastern District of North Carolina. The disclosure statement(s) detail Relator Howard's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

## II. RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

12. Any and all acts alleged herein to have been committed by the Defendants were committed by officers, directors, employees, representatives or agents, who at all times acted on behalf of the Defendants and within the course and scope of their employment, such that Defendants are jointly and severally liable under legal theories of respondeat superior and vicarious liability. Further, the past, present and continuing relations and dealings by and between Defendants are so inextricably intertwined that, for purposes of this suit, some or all of them can and should be considered as a single business enterprise at law and equity.

## III. BACKGROUND ON GOVERNMENT CONTRACTING

A. **Federal Contracting Process for Construction Projects**

3

13. The United States Government, along with its departments and subdivisions, engages in contracting for services and products on a daily basis. Among these contracts, the Government contracts for work related to construction projects at various locations, such as military bases. The Government generally obtains contracts for large construction projects through a competitive negotiation process that typically involves two phases.

14. The process begins when the contracting officer issues a solicitation that delineates the scope of work and states the Government's requirements, including but limited to design criteria, budget parameters, and schedule. *See* F.A.R. § 36.302. The contracting process involves two phases. In Phase I, the solicitation generally covers the technical aspects of the project. *See* F.A.R. § 36.303-1. General contractors submit proposals for the project. The Government then evaluates each offeror's technical competencies and other non-price/cost-related factors against stated evaluation criteria. The Government then selects the most highly qualified offerors, which generally does not exceed a maximum number specified in the solicitation and, in any case, does not exceed five offerors. *Id.*

15. The selected offerors then proceed to Phase II of the process and submit proposals that expound upon the technical aspects and include cost proposal data. *See* F.A.R. §§ 15.304, 36.303-2. If the amount of the construction contract at issue is expected to exceed $1,000,000, the offeror's Phase II proposal must include a Subcontracting Plan regarding the extent of participation of small business concerns, which constitutes the "socioeconomic evaluation factor" of the offeror's proposal. *See* F.A.R. § 15.304(c)(4). Additionally, solicitations that offer a significant opportunity for subcontracting require the offerors' proposals to include a small business Subcontracting Plan as part of the evaluation. *See* F.A.R. § 15.304(c)(5).

4

16. In awarding such large construction contracts, the Government is not seeking the lowest possible bidder to perform the work.  Instead, the Government is seeking the contractor that can best deliver the full continuum of final product, consistent with all applicable goals, laws, rules and regulations applicable to the product, which expansively include certain requirements for the participation of Disadvantaged Business Enterprises through the requisite Small Business Subcontracting Plan.  As established in various federal statutes and regulations, Disadvantaged Business Enterprises include business concerns that are Women Owned Small Business (WOSB's), Veteran Owned Small Business (VOSB's), Service Disabled Veteran Owned Small Business (SDVOSB's), and the like.

**B.      Small Business Concerns**

17. 15 U.S.C. §637 provides the statutory authority for the participation by small business concerns, and disadvantaged business concerns, in the performance of contracts let by any Federal agency, including the Department of Defense.  This law specifies that small businesses will have "maximum practical opportunities" to participate in contract performance consistent with efficient performance.  The law further mandates the inclusion into the pertinent contracts of language so stating this policy.  The relevant language is set forth in FAR 52.219-8 ("Utilization of Small Business Concerns"), which states:

    (a)    **It is the policy of the United States that** small business concerns, **veteran-owned small business concerns, service-disabled veteran-owned small business concerns,** HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns **shall have the maximum practicable opportunity to participate in performing contracts let by any Federal agency,** including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems. It is further the policy of the United States that its prime contractors establish procedures to ensure the timely payment of amounts due pursuant to the terms of their

subcontracts with small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns.

(b) **The Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with efficient contract performance.** The Contractor further agrees to cooperate in any studies or surveys as may be conducted by the United States Small Business Administration or the awarding agency of the United States as may be necessary to determine the extent of the Contractor's compliance with this clause.

(c) Definitions. As used in this contract—

"HUBZone small business concern" means a small business concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration.

**"Service-disabled veteran-owned small business concern"—**

**(1) Means a small business concern—**

**(i) Not less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and**

**(ii) The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran.**

**(2) Service-disabled veteran means a veteran, as defined in 38 U.S.C. 101(2), with a disability that is service-connected, as defined in 38 U.S.C. 101(16).**

**"Small business concern" means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto.**

"Small disadvantaged business concern" means a small business concern that represents, as part of its offer that—

(1) It has received certification as a small disadvantaged business concern consistent with 13 CFR part 124, Subpart B;

(2) No material change in disadvantaged ownership and control has occurred since its certification;

(3)    Where the concern is owned by one or more individuals, the net worth of each individual upon whom the certification is based does not exceed $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); and

(4)    It is identified, on the date of its representation, as a certified small disadvantaged business in the database maintained by the Small Business Administration (PRO-Net).

**"Veteran-owned small business concern" means a small business concern—**

**(1)    Not less than 51 percent of which is owned by one or more veterans (as defined at 38 U.S.C. 101(2)) or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and**

**(2)    The management and daily business operations of which are controlled by one or more veterans.**

"Women-owned small business concern" means a small business concern—

(1)    That is at least 51 percent owned by one or more women, or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(2)    Whose management and daily business operations are controlled by one or more women.

(d)    Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as a small business concern, a veteran-owned small business concern, a service-disabled veteran-owned small business concern, a HUBZone small business concern, a small disadvantaged business concern, or a women-owned small business concern.

(emphasis added).

18. 15 U.S.C. §637 further provides the statutory authority for the FAR that implements the

participation by small business concerns, FAR 19.7, which states, in part:

19.702  Statutory requirements.

Any contractor receiving a contract for more than the simplified acquisition threshold must agree in the contract that small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns will have the maximum practicable opportunity to participate in contract performance consistent with its efficient performance. It is further the policy of the United States that its prime contractors establish procedures to ensure the timely payment of amounts due pursuant to the terms of their subcontracts with small business, veteran-owned small business, service-disabled veteran-

7

owned small business, HUBZone small business, small disadvantaged business, and
women-owned small business concerns.

      (a)    Except as stated in paragraph (b) of this section, Section 8(d) of the Small
Business Act (15 U.S.C. 637(d)) imposes the following requirements
regarding subcontracting with small businesses and small business
subcontracting plans:

           (1)    In negotiated acquisitions, each solicitation of offers to perform a
contract or contract modification, that individually is expected to
exceed $550,000 ($1,000,000 for construction) and that has
subcontracting possibilities, shall require the apparently successful
offeror to submit an acceptable subcontracting plan. If the
apparently successful offeror fails to negotiate a subcontracting
plan acceptable to the contracting officer within the time limit
prescribed by the contracting officer, the offeror will be ineligible
for award.

19. Read together, 15 U.S.C. §637, FAR 19.7, and FAR 52.219-8 declare and mandate that it
is the policy of the United States to allow maximum practical opportunities for small and
disadvantaged businesses to participate in Government contracts. Subcontracting Plans,
therefore, are mandatory for construction contracts exceeding $1,000,000.

20. Under the pertinent regulations, the Small Business Administration defines a small
business concern as one that is independently owned and operated, is organized for profit,
and is not dominant in its field. Depending on the industry, size standard eligibility is
based on the average number of employees for the preceding twelve months or on sales
volume averaged over a three-year period. Annual receipts of a concern which has been
in business for less than three complete fiscal years is measured by the total receipts for
the period the concern has been in business divided by the number of weeks in business,
multiplied by 52. As described on the SBA website, "A small business concern is a small
business that is not dominant in the field of operation for which it is bidding on a

8

government contract, in addition to qualifying as a small business under the criteria and size standards in Title 13, Code of Federal Regulations, part 121 (13 CFR 121). Size standards have been established for types of economic activity, or industry, generally under the North American Industry Classification System (NAICS)." See http://www.sba.gov/content/size-standards, and 13 CFR 121.101, *et seq*.

21. A Small Business size standard is numerical and represents the largest a concern can be and still be considered a small business. Receipts are averaged over a concern's latest three (3) completed fiscal years to determine its average annual receipts (and for concerns that have been in business for less than three complete fiscal years, the total receipts for the period the concern has been in business divided by the number of weeks in business, multiplied by 52). The SBA size standard limitation to qualify as a "Small Business Concern" for businesses in the Specialty Trade Contractors, Masonry Contractors subsector, is $14 million in average annual receipts. See, U.S. Small Business Administration, Table of Small Business Size Standards Matched to North American Industry Classification System Codes.

http://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf, and 13 CFR 121.101, *et seq.*

22. The SBA determines whether an entity qualifies as a small business concern by counting its receipts, employees, or other measure including those of all its domestic and foreign affiliates, regardless of whether the affiliates are organized for profit. 13 C.F.R. §121.103(a)(6). SBA's regulations on affiliation are contained in 13 C.F.R. §121.103.

23. "Affiliation" exists when one business controls or has the power to control another or when a third party (or parties) controls or has the power to control both businesses.

9

Control may arise through ownership, management, or other relationships or interactions between the parties. If one or more officers, directors, managing members, or general partners of a business controls the Board of Directors and/or the management of another business the businesses are affiliates.

24. "Affiliation" also exists when there is an identity of interest between individuals or businesses, including family members. Individuals or firms that have identical (or substantially identical) business or economic interests may be treated as though they are affiliated unless they can demonstrate otherwise. Family members, persons with common investments, or firms that are economically dependent through contractual (or other) relationships, are among those treated this way. Patterns of subcontracting, commingling of staff and/or facilities, and other veiled attempts to disguise the true nature of the relationship may evidence an identity of interest.

## IV.    **FACTUAL ALLEGATIONS**

### A.    **Overview of Defendants**

25. Frazier Masonry is a full-service commercial masonry contractor specializing in brick, stone, and block structures, as well as concrete paving. Frazier Masonry is one of the largest masonry companies in the United States. Frazier Masonry was founded in 1974 by Don Frazier and was originally called "Don Frazier and Sons Masonry." In 1985, the company was renamed Frazier Masonry Corporation. In 1988, founder Don Frazier brought his two sons, Defendant Russell ("Russ") Frazier and Michael ("Mike") Frazier [not a defendant], into the family business as partners. Russ and Mike Frazier, who now serve as President and Vice President respectively, purchased their father's interest in the company in 2002. Frazier Masonry earns extensive revenues through its work on federal

10

government construction projects, usually as a masonry subcontractor to prime or general contractors.

26. Harper Construction is ranked among the Top 400 construction companies, the Top 100 Design Build firms, and the Top 100 Green contractors in the United States. It is the second largest privately-held company in San Diego, California. It reported revenues in 2010 of approximately $360 million. Harper Construction earns substantial revenues in government contracting. Government contracts make up almost half of its contracts. Harper Construction recently completed several Bachelor Enlisted Quarters ("BEQs") at Camp Pendleton, California, at a contract price of $140 million – merely one of several BEQ packages and other major construction projects that Harper Construction has built at Camp Pendleton since 2008. Harper Construction has performed government contracting work for the U.S. military all around the world and the United States, as well as substantial construction work for various state and local governments. The website www.govenrmentcontractswon.com reports that in excess of $1.5 billion worth of federal government contracts have been awarded to Harper Construction since 2002.

27. F-Y was incorporated in California on July 20, 2011. Defendant Robert Yowell is President of F-Y. Yowell is also an employee of Frazier Masonry and he is married to Holly Frazier, who is the daughter of Frazier Masonry's owner Russ Frazier. Defendant Harper Construction awarded contracts to F-Y in 2011 in the amount of $21,764,019.

28. The individual Defendants, and each of them, were acting within the course and scope of their employment at all relevant times when they engaged in the conduct described in this Complaint.

**B. Relator's Discovery of the Defendants' Fraudulent Scheme to Create Sham Businesses to Garner Government Contracting Work**

11

### 1. Relator Discovers Defendants' Fraudulent Conduct While Working on the Courthouse Bay Project

29. Relator Rickey Howard (hereafter "Relator Howard") is a resident of the State of North Carolina. Relator Howard has been involved in the masonry trade and construction industry his entire career. Relator Howard was hired by Frazier Masonry at the end of 2011, and began working as a Project Manager at Frazier Masonry on January 4, 2012, and is currently still employed with that company.

30. Relator Howard's first assignment as Project Manager for Frazier Masonry was to lead two projects, the first being the P136 BEQ project at Marine Corps Air Station Cherry Point, and the second being the Tarawa Elementary School project at Marine Corps Base Camp Lejeune ("MCB Camp Lejeune"). The General Contractor on these projects is RQ Construction, through its Joint Venture with Kisaq, LLC (an Alaska LLC, which is ultimately owned by Alaska-native Americans [Inupiat Eskimo people]). The joint venture is known as Kisaq-RQ JV.

31. Russ Frazier also specifically hired Relator Howard to use his experience, local knowledge and business connections in North Carolina to help Frazier Masonry land masonry subcontracts on government projects on the East Coast, including federal government construction projects at military bases in Eastern North Carolina.

32. One of the masonry subcontract projects for which Frazier Masonry submitted a proposal was the Courthouse Bay project at MCB Camp Lejeune. Harper Construction is serving as the General Contractor for the Courthouse Bay Project, having been awarded that contract by NAVFAC on August 31, 2011. Relator Howard learned from Russ Frazier, President of Frazier Masonry, that Frazier Masonry had an excellent chance of being

12

awarded the masonry subcontract because of long-standing contractor/subcontractor

relationships between Harper Construction and Frazier Masonry in various government

and military construction projects on the West Coast, including Prime/Sub relationships

on BEQ projects at Camp Pendleton in California, and elsewhere out west.

### a. Scope of Courthouse Bay Project

33. MCB Camp Lejeune, which opened in September 1941, is the largest Marine Corps Base

on the East Coast, and occupies approximately 246 square miles in Onslow County,

North Carolina. MCB Camp Lejeune is home base for the II Marine Expeditionary

Force, 2d Marine Division, 2d Force Service Support Group, and other combat units and

support commands, which amount to some 47,000 active Marine and Sailors, exclusive

of the dependent, retiree and civilian employee population which, altogether, totals nearly

150,000 people.

34. On October 17, 2006, the United States Congress authorized an increase in end strength

of the United States Marine Corps (USMC) from 175,000 to 179,000 Marines. The

majority of the personnel increase is to become permanently stationed at MCB Camp

Lejeune.

35. In connection with that increase in force, and at the same time to upgrade the existing

infrastructure at MCB Camp Lejeune, Congress authorized approximately $3.53 billion

of military construction at the base, to be paid from fiscal year budgets 2008 through

2012, with completion of all construction scheduled for calendar year 2015.

36. One substantial area of new construction taking place at Camp Lejeune is the Courthouse

Bay area of the base, and includes the design and construction of Bachelor Enlisted

Quarters, referred to as "BEQs", as well as other buildings.

13

37. In early 2011, Naval Facilities Engineering Command Mid-Atlantic in Norfolk, Virginia ("NAVFAC Mid-Atlantic") issued a solicitation [Solicitation Number: N40085-11-R-4009] for the construction of BEQs at Courthouse Bay area of MCB Camp Lejeune. A copy of the Original Synopsis for NAVFAC Mid-Atlantic Solicitation Number: N40085-11-R-4009 is attached hereto as **Exhibit 1**.

38. NAVFAC Mid-Atlantic described the project as a "Design/Build contract to construct four 100-room, multi-story bachelor enlisted quarters (BEQs) . . . ." A true copy of the NAVFAC Mid-Atlantic Description of Solicitation Number: N40085-11-R-4009 is attached hereto as **Exhibit 2.** The BEQs are often referred to as the P-1251 and P-1254 BEQs. *See* **Exhibit 2**.

39. Harper Construction submitted a proposal to NAVFAC Mid-Atlantic in response to Solicitation Number: N40085-11-R-4009. On August 31, 2011, Harper Construction was awarded the contract with a value of $70,986,817. *See* **Exhibit 2**.

> **b. Harper Construction Awards Masonry Subcontract to *Frazier Masonry*, and the Companies Then Agree to Use F-Y, a Sham "Small Business" Corporation to Meet Subcontracting Plan Requirements**

40. As part of the negotiation process, Phase II of Harper Construction's proposal for the Courthouse Bay project [and the basis upon which it was awarded the Contract] included a Subcontracting Plan, representing that a defined amount of the contract would be subcontracted and that specified percentages of the subcontracting work would be awarded to "small business concerns" including HUBZone, WOSB, SDB, VOSB, and SDVOSB concerns. In or around April 2012, Harper Construction began accepting bids for the masonry subcontract masonry work on the Courthouse Bay BEQs (P-1251 and P-1254 BEQs).

41. In April 2012, Frazier Masonry prepared and submitted a proposal for the masonry
    subcontract work on the Courthouse Bay BEQs. A true copy of Frazier Masonry's bid
    proposal is attached hereto as **Exhibit 3**. Russ Frazier explained to Relator Howard that
    Frazier Masonry had an excellent chance to be awarded the masonry subcontract based
    on Frazier Masonry's prior relationship with Harper Construction at numerous federal
    government construction projects and private projects on the West Coast. Russ Frazier
    stated that Harper Construction is Frazier's "best customer" on the West Coast.

42. On April 12, 2012, Relator Howard attended a meeting with Russ Frazier and Andy
    Anello (Courthouse Bay Project Manager for Harper Construction) regarding the
    Courthouse Bay project. During the meeting, Andy Anello stated that a minority-owned
    company would need to be used in order for Frazier Masonry to get the masonry
    subcontract. Russ Frazier explained that he "could use his disabled-veteran owned small
    business company" called F-Y, Inc. ("F-Y") that he had used from time-to-time on
    Government projects.

43. Four days later, when Relator Howard expressed concerns to Russ Frazier regarding
    Frazier Masonry's "use" of F-Y to "get the contract," Russ Frazier responded that "It will
    be the last thing they [the Government] will be looking for on the East Coast." Russ
    Frazier continued with his reasoning to justify the sham, saying: "All the liability will fall
    on the General Contractor [Harper] and on F-Y, none on Frazier. We do it all the time on
    the West Coast. I don't know how much it is done on the East Coast."

44. On April 20, 2012, Harper's Project Manager Andrew Anello informed fellow co-
    workers, Brian Crowley (Design Manager at Harper Construction) and Kenton Ahrentzen
    (also an employee of Harper Construction), that Harper Construction "made a deal with

15

Frazier Masonry for the BEQ project at Camp Lejeune." A true copy of the April 20,
2012 email from Andrew Anello to various team members is attached hereto as **Exhibit
4**.

45. Shortly thereafter, on April 24, 2012, Relator Howard became increasingly more
concerned about Frazier Masonry's "arrangement" with Harper Construction after
receiving a forwarded e-mail from Russ Frazier in which Andy Anello informed Russ
Frazier that Harper was "close to an agreement with ThysennKrupp Elevators" for the
Courthouse Bay project, but they were a large business and Harper "need[s] to contract
them as a small biz." Anello then proceeded to inquire if Frazier Masonry had ever taken
on an elevator contract. A true copy of the April 24, 2012 e-mail from Russ Frazier to
Relator Howard is attached hereto as **Exhibit 5**. Frazier Masonry ultimately decided not
to perform the elevator contract.

46. Over the next several days, the Harper Construction and Frazier Masonry team members
exchanged e-mails regarding the design requirements for the BEQs and changes to the
masonry plan and setting up a "roundtable" meeting between the companies to discuss
the scope of the masonry subcontract for Courthouse Bay and the minority participation
via subcontracts needed on the project in order to fulfill the Subcontracting Plan. A true
copy of these e-mail exchanges is attached hereto as **Exhibit 6**.

47. On May 1, 2012, Relator Howard attended a roundtable meeting between Harper
Construction and Frazier Masonry at the Harper Construction jobsite trailer at Camp
Lejeune. At the meeting, Russ Frazier pulled Relator Howard into a separate closed-door
meeting in which Anello and Frazier agreed that material for the project would be bought
through the minority company, F-Y, but all the fees would stay in a Frazier contract.

16

Anello and Frazier discussed how the total $9.2 million contract would be split into two components: $4.5 million to F-Y for material and $4.7 million to Frazier for labor. After the meeting, Russ Frazier and the rest of the Frazier Masonry team flew back to the West Coast, leaving Relator Howard to manage the project.

48. At this point, it was clear that Frazier Masonry was using F-Y as a sham "small business" company (either as VOSB or a SDVOSB) in order to "get" the masonry subcontract. The representations regarding F-Y's "small business" status were false and fraudulent in that F-Y was not, and could not qualify to be, a "small business" under the SBA's "Affiliation Rules." Frazier Masonry and F-Y are clearly affiliated companies, and as such, under the SBA Affiliation Rules set forth in 13 C.F.R. § 121.103, all the revenues of Frazier Masonry would have to be attributed to F-Y in determining whether F-Y was a legitimate small business, and plainly, it was not.

49. Specifically, the SBA Affiliation Rules say, among other things, that "In determining the concern's size, SBA counts the receipts, employees, or other measure of size of the concern whose size is at issue and all of its domestic and foreign affiliates, regardless of whether the affiliates are organized for profit." 13 C.F.R. § 121.103(a)(6).

50. SBA Affiliation Rules also bar affiliation based on "Identify of Interest." This Affiliation prohibition states: "*Affiliation based on identity of interest.* Affiliation may arise among two or more persons with an identity of interest. Individuals or firms that have identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships) may be treated as one party with such interests aggregated. Where SBA determines that such interests should be aggregated, an

17

individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate." 13 C.F.R. § 121.103(f). Not only is Rob Yowell a long-time employee and Project Manager of Frazier Masonry [and evidently still is], as of May 5, 2012 – the wedding date of Rob Yowell and Holly Frazier – Yowell is Russ Frazier's son-in-law. In fact, the only two employees of F-Y are Russ Frazier's daughter and son-in-law, Rob and Holly Frazier Yowell.

51. SBA Affiliation Rules also bar affiliation based on "Newly Organized Concerns." This Affiliation prohibition states:  "*Affiliation based on the newly organized concern rule.* Affiliation may arise where former officers, directors, principal stockholders, managing members, or key employees of one concern organize a new concern in the same or related industry or field of operation, and serve as the new concern's officers, directors, principal stockholders, managing members, or key employees, and the one concern is furnishing or will furnish the new concern with contracts, financial or technical assistance, indemnification on bid or performance bonds, and/or other facilities, whether for a fee or otherwise. A concern may rebut such an affiliation determination by demonstrating a clear line of fracture between the two concerns. A "key employee" is an employee who, because of his/her position in the concern, has a critical influence in or substantive control over the operations or management of the concern." 13 C.F.R. § 121.103(g). F-Y had been incorporated less than a year previously [on July 18, 2011]. Yet, in that first less-than-half year, it did some $21.7 million worth of business with Harper Construction.

52. Based on that first contract with Harper Construction, F-Y simply could not qualify as a "Small Business." *See* 13 C.F.R. § 121.104(c)(2).

18

53. At this point, Relator Howard learned from Russ Frazier that he owned F-Y. The "F" in the name of the company stands for Frazier, and the "Y" stands for Yowell. Rob Yowell was a Project Manager at Frazier Masonry and was listed as the sole member of F-Y, a California corporation formed on July 18, 2011, with its primary place of business listed as 6965 El Camino Real, Suite 105-618, Carlsbad, California 92009. This address belongs to a UPS Store/copy shop. F-Y's Registered Agent address is 1682 Marbella Drive, Vista, California 92081 – which is Yowell's home address.

54. Other than Rob Yowell, the only other employee who has worked for F-Y is Holly Frazier, the daughter of Russ Frazier who married Rob Yowell on May 5, 2012, and who resigned from Frazier Masonry nine days later on May 14, 2012, to work with her husband at F-Y.

55. On May 8, 2012, a week after the roundtable meeting, Russ Frazier told Relator Howard that two contracts would be signed: one with Frazier Masonry for labor and one with F-Y for materials. Russ Frazier then instructed Relator Howard to make material orders with masonry vendors under Frazier Masonry, and that Frazier Masonry would guarantee payment of the material orders. Russ Frazier explained to Relator Howard that the Purchase Order commitments would be submitted to the vendors later through F-Y. To allay Relator Howard's concerns, Russ Frazier then stated: "Don't worry Rickey, we do this all the time and have two to three deals like this going on currently with Harper." Harper Construction has in fact used Frazier Masonry as its masonry subcontractor on most of the work done by Harper Construction at Camp Pendleton. Based on what Russ Frazier was saying, the Camp Pendleton work was "passed through" sham small business

entities (either F-Y, or some other corporation – identified here as ABC Corporations 1 through 10) that were owned or controlled by, or affiliated with Frazier Masonry.

56. The next day, Debbie Wall, Controller for Frazier Masonry, sent an e-mail to the Frazier Masonry employees and Rob Yowell at his F-Y e-mail account changing the Job Number for the Courthouse Bay project from 051203 to 551202.

57. Almost a week later, on May 14, 2012, according to Russ Frazier, the *entire* subcontract was then to be executed between Harper and F-Y, as opposed to the two separate contracts discussed earlier. F-Y would then, in turn, subcontract with Frazier for the labor. A Payment and Performance Bond (Bond Number 6070996) for the Courthouse Bay project was issued bearing the date of May 17, 2012, on behalf of F-Y as Principal through Westfield Insurance Company, as Surety, in the amount of $9,157,220.00. The bond states that F-Y entered into a subcontract with Harper on May 8, 2012, although the subcontract with F-Y was not actually executed until May 14, 2012. A true copy of the Payment and Performance Bond issued on behalf of FYI, as Principal, is attached hereto as **Exhibit 7**. F-Y, in its own right, had never submitted a bid or proposal for the masonry subcontracting work to Harper Construction.

58. In furtherance of the scheme, Frazier Masonry represented to material vendors that Frazier Masonry would guarantee F-Y's material purchases. On May 21, 2012, Relator Howard attended a meeting with Russ Frazier and Parrish Hoffman, a sales representative for Adams Concrete, the largest local concrete vendor, about the purchase of building materials for the Courthouse Bay project; the details of this meeting were later memorialized in an e-mail. A true copy of the May 24, 2012 e-mail from Holly Frazier Yowell is attached hereto as **Exhibit 8**.

20

59. At the meeting on May 21, 2012, Russ Frazier explained to Hoffman that Harper Construction was "forcing" Frazier Masonry to perform the masonry subcontract using a minority company, F-Y, which was owned by Rob Yowell, Frazier's son-in-law. Russ Frazier further stated that Frazier Masonry would "guarantee everything," and that Harper Construction would issue joint checks for payment to "F-Y, Inc. and Adams Concrete" for the materials. Russ Frazier stated that all Purchase Orders should list F-Y, but that the bills and invoices for materials should be sent to Frazier Masonry's North Carolina office for processing and coding, and that the payments would be made from California. Russ Frazier further stated that Frazier Masonry would fill out a credit application for F-Y. On May 22, 2012, Russ Frazier proposed the same deal to S.T. Wooten, another concrete vendor, in discussing the purchase of approximately $700,000 worth of concrete material for the Courthouse Bay project.

60. That same day, May 22, 2012, Russ Frazier directed Relator Howard to open a North Carolina Post Office Box in the name of Frazier Masonry, the address of which is P.O. Box. 397, Jacksonville, NC 28541-0397. The next day, Holly Frazier Yowell sent an e-mail to Mark Horwedel [a Senior Project Manager with of Frazier Masonry, and who happens to be Russ Frazier's brother-in-law] requesting the P.O. Box information "ASAP." Holly Yowell stated that "Russ informed [her] that he would like the F-Y Inc vendor invoices mailed directly to your [Frazier's] office so that Sky can code them, have you approve them, and then mail them to me to post in F-Y Inc. accounting." A true copy of the May 23, 2012 e-mail from Holly Yowell is attached hereto as **Exhibit 9**. In fact, at present, all mail, invoices and billings of F-Y at the Camp Lejuene Courthouse Bay Project are being sent to Frazier Masonry's N.C. Post Office Box.

61. Around this same time, Relator Howard learned that Russ Frazier's brother-in-law, Mark Horwedel, would be coming from the West Coast to act as the "Official" Project Manager of the Courthouse Bay Project on behalf of Frazier Masonry, but that Relator Howard would remain "in charge" of the everyday operations at Courthouse Bay. On May 24, 2012, Relator Howard discussed the mechanics of the arrangement between Frazier Masonry and F-Y with Horwedel, so that Relator Howard would be able to deal with any questions relating to the material vendors arrangements while Horwedel was out of town. Horwedel explained that Frazier Masonry would act as a "Second Tier" subcontractor to F-Y on the project, and that "this is how we've had to handle minority participation several times over the last seven years."

62. Later that day, Relator Howard was contacted by Parrish Hoffman of Adams Concrete regarding the Courthouse Bay project. Hoffman explained that the credit manager at Adams Concrete "did not like" how the paperwork on the Courthouse Bay project was submitted originally by Frazier Masonry and then changed to F-Y, which was an "unknown company." Hoffman further advised Relator Howard that Adams Concrete might deny credit to F-Y for materials purchases. Relator Howard relayed the problem to Horwedel, who told him that Holly Yowell would provide Relator Howard with the information and documents concerning the transactions and set up for the materials purchase from Adams Concrete. The purchase of materials from Adams Concrete on this job are expected to be in excess of $3 million.

63. Shortly thereafter, Relator Howard was copied on an e-mail from Holly Frazier Yowell to Hoffman at Adams Concrete requesting that Adams Concrete forward invoices for materials to Frazier Masonry's North Carolina P.O. Box. See **Exhibit 8**.

22

64. The next day, Hoffman informed Relator Howard that Harper Construction was refusing to issue joint checks to F-Y and Adams Concrete. Relator Howard then relayed this information to Russ Frazier, who in turn stated that "My job is to protect Harper, and I'll do whatever it takes to personally guarantee Adams Concrete receives payment through Frazier. I will handle everything on Tuesday [May 29, 2012]."

65. On May 29, 2012, Hoffman informed Relator Howard that Russ Frazier agreed to provide a payment guarantee to Adams Concrete on behalf of F-Y, and that an agreement in writing to this effect was to be prepared and submitted by Frazier Masonry to Adams Concrete.

66. Although Harper Construction subcontracted with F-Y for the masonry work, the entirety of performance and management of the masonry subcontract was, and is being done, entirely done by Frazier Masonry employees. The only persons who were ever "employed" by F-Y were Rob Yowell (who simultaneously is also a Project Manager for Frazier Masonry), and Holly Frazier Yowell – Russ Frazier's daughter and Rob Yowell's new wife. Almost all of the management and paperwork that was done or issued for F-Y was in fact done or issued by Frazier Masonry employees. Both F-Y and Frazier Masonry occupy the same field office at the Courthouse Bay project, and all invoices for materials on the Courthouse Bay project were (and are being) sent to Frazier Masonry's North Carolina P.O. Box and coded by a Frazier Masonry employee before being sent to F-Y for "accounting purposes."

67. F-Y's subcontract with Frazier Masonry to perform the Courthouse Bay masonry subcontract work (in essence a "pass through") is a sham, because this arrangement is not

23

a legal and legitimate method of complying with the "small business" part of Harper

Construction's Subcontracting Plan.

### 2. Relator Learns that Defendants' Fraudulent Conduct is Widespread

68. Russ Frazier's brother-in-law (and Frazier Masonry's nominal "Senior Project Manager")

Mark Horwedel admitted to Relator Howard in a conversation on May 24, 2012, that

Frazier Masonry had engaged in similar schemes as described above several times over

the past seven years. In a later conversation, Horwedel specifically told Relator Howard

that Frazier Masonry had used the same set-up with F-Y on a BEQ project at Camp

Pendleton in California. More specifically, Horwedel has stated to Relator Howard that

Frazier Masonry has utilized various companies, owned and/or controlled by Frazier

Masonry and/or Russ Frazier that amount to "sham" small businesses, to fulfill

Subcontracting Plan requirements on various federal government construction projects on

the West Coast, and further that several of the material suppliers for these entities were

aware of the fraudulent nature of these sham businesses and that the material suppliers

were paid premiums or kickbacks for supplying materials to the sham small businesses –

on jobs that were actually performed by Frazier Masonry.

69. Harper Construction has been awarded, and has completed, numerous very large

construction projects at Camp Pendleton since at least 2007. It is reported that F-Y was

paid some \$21.7 million in subcontract revenues by Harper Construction in 2011, even

though F-Y was not even incorporated until July 18, 2011. There were other "sham small

businesses" used to facilitate these schemes prior to the formation of F-Y in July 2011,

which are identified herein as ABC Corporations 1 though 10.

## V.   ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT

24

70. This is an action to recover damages and civil penalties on behalf of the United States and Relator Howard arising from the false and/or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§3729–3732.

71. Based on these relevant FCA provisions, Relator Howard, on behalf of the United States Government, seeks through this action to recover damages and civil penalties arising from Defendants' submission and/or causation of the submission of false claims to the federal government. Relator Howard believes that the United States has suffered significant harms and damages as a result of entering into the Courthouse Bay contract with Harper Construction based up the false representations by Harper Construction and its subcontractors, including but not limited to Frazier Masonry and F-Y, and the false claims for payment submitted thereon, *and* that the United States similarly has suffered significant harms and damages by virtue of near-identical schemes perpetrated against the Government by the same actors with respect to military construction contracts at Camp Pendleton and other facilities elsewhere in the United States.

## A. The False Claims Act

72. For conduct occurring before May 20, 2009, the False Claims Act ("FCA") provides in pertinent part that:

(a) Any person who:

> presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

    \*    \*    \*

(7)    knowingly makes, uses, or causes to be made or used, a false
record or statement to conceal, avoid, or decrease an obligation to
pay or transmit money or property to the Government,

is liable to the Government for a civil penalty of not less than $5,500 and not more than

$11,000 for each such claim, plus three times the amount of damages sustained by the

Government because of the false or fraudulent claim. 31 U.S.C. §3729(a). The FCA

defined "claim" at that time to include: "any request or demand, whether under a contract

or otherwise, for money or property which is made to a contractor, grantee, or other

recipient if the United States Government provides any portion of the money or property

which is requested or demanded, or if the Government will reimburse such contractor,

grantee, or other recipient for any portion of the money or property which is requested or

demanded." 31 U.S.C §3729(c).

73. For conduct occurring on or after May 20, 2009, the FCA provides that any person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for
payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement
material to a false or fraudulent claim (except that this language applies to all
claims pending on or after June 7, 2008);

(C)    conspires to defraud the Government by committing a violation of the FCA;

(D)    knowingly makes, uses, or causes to be made or used, a false record or statement
to conceal material to an obligation to pay or transmit money or property to the
Government

\*    \*    \*

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement
material to an obligation to pay or transmit money or property to the Government,
or knowingly conceals or knowingly and improperly avoids or decreases an
obligation to pay or transmit money or property to the Government,

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000

for each such claim, plus three times the amount of damages sustained by the Government

because of the false or fraudulent claim. 31 U.S.C. §3729(a)(1).

74. The amended FCA defines "claim" as:

(A) mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

75. The FCA allows any persons having knowledge of a false or fraudulent claim against the

Government to bring an action in Federal District Court for themselves and for the United

States Government and to share in any recovery as authorized by 31 U.S.C. §3730.

**B.     Defendants Submitted False and/or Fraudulent Claims for Payment to the Federal Government and/or Caused Entities to Submit False and/or Fraudulent Claims for Payment**

76. From at least approximately 2007 forward, Harper Construction represented, warranted

and certified, expressly and/or impliedly, to the United States that it was fully compliant

with the small business concern subcontracting requirements contained within the Federal

Acquisition Regulations and with all federal laws, including but not limited to the Anti-

Kickback Act, 41 U.S.C. § 53. For example, in the context of the Courthouse Bay

Contract Award, NAVFAC Mid-Atlantic Solicitation Number: N40085-11-C-4009,

Harper Construction represented, warranted, and certified, expressly and/or impliedly, to

27

the United States that it was fully compliant with the subcontracting requirements on the basis that it utilized F-Y to fulfill the Veteran-Owned Small Business (VOSB) concern subcontract requirements, and/or the Service Disabled Veteran-Owned Small Business (SDVOSB) concern subcontract requirements – notwithstanding that F-Y was a sham "Small Business" company, and a puppet of Frazier Masonry which had been created to fool the Government.

77. The United States has been harmed by the foregoing conspiracy of the Defendants to create sham companies to fulfill the small business concern Subcontracting Plan requirements of its federal construction projects, including NAVFAC Mid-Atlantic Solicitation Number: N40085-11-C-4009, and other contracts at Camp Pendleton, and by the false and fraudulent claims submitted by the corporate defendants Harper Construction, Frazier Masonry, F-Y, ABC Corporations 1 through 10, and with regard to other small business concern Subcontracting Plan requirements of federal construction projects – as admitted to by management and principals of the Defendants – as the evidence will show.

78. All of the contracts awarded by the Government, including NAVFAC Mid-Atlantic, Solicitation Number: NAVFAC Mid-Atlantic Solicitation Number: N40085-11-C-4009, and other Government contracts including Harper Construction contracts at Camp Pendleton for which Frazier Masonry actually performed the masonry subcontracts, and otherwise as the evidence will show, are tainted by the fraud, and therefore the damages are the full amount of the contracts so awarded based upon these frauds.

79. Given the structure of the government contracting system, false statements, false representations, false records, and/or material omissions made by Defendants had the

28

potential to influence the payment decisions of the federal government. Because of the illegal acts described above, Defendants made hundreds of millions of dollars to which they were not legitimately entitled. The ultimate submission to the federal government of claims for payment was a foreseeable factor in the Government's loss, and a consequence of the scheme. Consequently, the United States Government has suffered substantial damages.

## C. Defendants Made, Used, or Caused to be Made or Used False Records and/or Statements to Receive Payment

80. Defendants knowingly made, used or caused to be made or used, false records or statements with specific intent to cause false and/or fraudulent claims to be paid or approved by the United States. These false statements or records consist of false certifications or representations, express and/or implied, of compliance with all laws, including but not limited to the small business concern subcontracting requirements contained within the Federal Acquisition Regulations and the Anti-Kickback Act, 41 U.S.C. § 53, made or caused to be made by Defendants, in requesting payments from the federal government for performing the contracts at issue in this case.

81. Given the structure of the government contracting system at issue, given the Defendants' false statements and representations, and given the false records and/or statements and/or material omissions that the Defendants made, used, or caused to be made or used, the Defendants' conduct had the potential to influence the payment decisions of the federal government.

82. The ultimate submission to the federal government of claims for payment, directly or indirectly, was a foreseeable factor in the Government's losses, and a consequence of the schemes. Consequently, the United States Government has suffered substantial damages.

29

**D.    Defendants Conspired to Commit Violations of the False Claims Act**

83. By virtue of planning, and then implementing, their schemes to create sham small
    business companies to fulfill the Subcontracting Plan requirements, Defendants conspired
    and confederated to commit violations of the False Claims Act, 31 U.S.C. §3729,
    including having conspired and confederated to have knowingly presented false or
    fraudulent claims for payment or approval; having knowingly made, used, or caused to be
    made or used false records or statements material to false or fraudulent claims; and
    having knowingly made, used, or caused to be made or used, false records or statements
    material to an obligation to pay or transmit money or property to the Government, or
    knowingly concealed or knowingly and improperly avoided or decreased an obligation to
    pay or transmit money or property to the Government.  The United States has suffered
    substantial damages as a result of the perpetration of Defendants' conspiracies.

**E.    Defendants Failed to Disclose Their Obligation to Repay the Federal
        Government in Violation of the Reverse False Claims Provisions of the False
        Claims Act**

84. In further consequence of the Defendants' fraudulent schemes in connection with the
    creation of sham small business companies used to fulfill federal subcontracting
    requirements, the Defendants knowingly made, used, or caused to be made or used, false
    records and/or statements to conceal, avoid, or decrease an obligation to pay (or to
    reimburse) money to the Government.  These false statements and/or records include but
    are not limited to false certifications or representations, express and/or implied, of
    compliance with all laws, including but not limited to the small business concern
    subcontracting requirements contained within the Federal Acquisition Regulations and

the Anti-Kickback Act, 41 U.S.C. § 53, made or caused to be made by the Defendants in obtaining the contract awards and/or in obtaining payment thereon.

85. By virtue of the false records and/or statements that Defendants made, used, or caused to be made or used or material omissions by Defendants, the United States has suffered substantial monetary damages.

### FIRST CLAIM FOR RELIEF
(FALSE CLAIMS – 31 U.S.C. §3729(a)(1)(A))

86. The allegations of all paragraphs in this Complaint are incorporated by reference.

87. In performing the acts described above, Defendants individually by and through their own acts, or through the acts of their agents, servants, officers and employees, knowingly and/or recklessly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A). Defendants represented, warranted and/or certified, expressly and/or impliedly, to the United States that they were fully compliant with all federal laws, including but not limited to the small business concern subcontracting requirements contained within the Federal Acquisition Regulations and the Anti-Kickback Act, 41 U.S.C. § 53.

88. The United States, unaware of the foregoing circumstances and conduct of the Defendants, awarded the Courthouse Bay BEQ Project, NAVFAC Mid-Atlantic Solicitation Number: N40085-11-R-4009, to Harper Construction, as well as projects at Camp Pendleton, California, and made full payments thereon, which resulted in its being damaged in an amount to be determined.

### SECOND CLAIM FOR RELIEF
(FALSE STATEMENTS – 31 U.S.C. §3729(a)(1)(B))

89. The allegations of all paragraphs in this Complaint are incorporated by reference.

90. In performing the acts described above, Defendants individually by and through their own acts, or through the acts of their agents, servants, officers and employees, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B). Defendants represented, warranted and/or certified, expressly and/or impliedly, to the United States that they were fully compliant with all federal laws, including but not limited to the small business concern subcontracting requirements contained within the Federal Acquisition Regulations and the Anti-Kickback Act, 41 U.S.C. § 53.

91. The United States, unaware of the foregoing circumstances and conduct of the Defendants, awarded the Courthouse Bay BEQ Project, NAVFAC Mid-Atlantic Solicitation Number: N40085-11-R-4009, to Harper Construction, as well as projects at Camp Pendleton, California, and made full payments thereon, which resulted in its being damaged in an amount to be determined.

## THIRD CLAIM FOR RELIEF
(CIVIL CONSPIRACY TO COMMIT VIOLATIONS
OF THE FALSE CLAIMS ACT – 31 U.S.C. §3729(a)(1)(C))

92. The allegations of all paragraphs in this Complaint are incorporated by reference.

93. The Defendants conspired and confederated to commit violations of the False Claims Act, 31 U.S.C. §3729, including having conspired and confederated to have knowingly presented false or fraudulent claims for payment or approval; having knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims; and having knowingly made, used, or caused to be made or used, false

records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

94. The United States, unaware of the foregoing circumstances and conduct of the Defendants and their conspiracy, awarded the Courthouse Bay BEQ Project, NAVFAC Mid-Atlantic Solicitation Number: N40085-11-R-4009, to Harper Construction, and made full payments thereon, which resulted in its being damaged in an amount to be determined.

95. Defendants further conspired and confederated to commit violations of the False Claims Act, 31 U.S.C. §3729, including having conspired and confederated to have knowingly presented false or fraudulent claims for payment or approval; having knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims; and having knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, with respect to government construction projects at Camp Pendleton, California.

96. The United States, unaware of the foregoing circumstances and conduct of the Defendants and their conspiracy, awarded construction projects to Defendants at Camp Pendleton, California, and made full payments thereon, which resulted in its being damaged in an amount to be determined

### FOURTH CLAIM FOR RELIEF
(REVERSE FALSE CLAIMS – 31 U.S.C. §3729(a)(1)(G))

97. The allegations of all paragraphs in this Complaint are incorporated by reference.

33

98. In performing the acts described above, Defendants knowingly used false records and statements to conceal the obligation to reimburse the federal Government for monies improperly retained, in violation of 31 U.S.C. §3729(a)(1)(G). Defendants represented, warranted and/or certified, expressly and/or impliedly, to the United States that they were fully compliant with all federal laws, including but not limited to the small business concern subcontracting requirements contained within the Federal Acquisition Regulations and the Anti-Kickback Act, 41 U.S.C. § 53.

99. Through Defendants' actions of improperly retaining funds to which they are not entitled, the United States has been deprived of the use of these monies and is entitled to damages in an amount to be determined.

## FIFTH CLAIM FOR RELIEF
(VIOLATION OF THE ANTI-KICKBACK ACT, 41 U.S.C. §53)

100.    The allegations of all paragraphs in this Complaint are incorporated by reference.

101.    Harper Construction, as prime contractor to the United States Government, illegally and unlawfully offered and then provided kickbacks to Frazier Masonry and/or F-Y in connection with the Courthouse Bay BEQ Project, and with respect to projects at Camp Pendleton, California.

102.    Frazier Masonry and/or F-Y, illegally and unlawfully accepted kickbacks offered and paid to them by Defendant Harper Construction, prime contractor to the United States Government, in connection with the Courthouse Bay BEQ Project, and with respect to projects at Camp Pendleton, California.

103.    The United States, unaware of the foregoing circumstances and conduct of the Defendants and their unlawful and illegal kickbacks and kickback scheme, awarded the Courthouse Bay BEQ Project, NAVFAC Mid-Atlantic Solicitation Number: N40085-11-

34

R-4009, to Harper Construction, and similarly awarded other construction projects to

Harper Construction at Camp Pendleton, California, and made full payments thereon,

which resulted in its being damaged in an amount to be determined.

## PRAYER FOR RELIEF

Relator Howard, on behalf of himself and the United States Government, prays as

follows:

1. That for violations of the Federal False Claims Act, 31 U.S.C. §3729, *et seq.*, this Court enter Judgment against the Defendants, jointly and severally, in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. §3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

2. That the Relator Howard be awarded all costs incurred, including reasonable attorneys' fees;

3. That, in the event the United States Government, continues to proceed with this action, the Relator Howard be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages in the amount of 25% of the proceeds of the action or settlement of the claim, or the maximum allowed under applicable law;

4. That, in the event that the United States, does not proceed with this action, the Relator Howard be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages in the amount of 30% of the proceeds of the action or the settlement, or the maximum allowed under applicable law;

5. That Relator Howard be awarded all costs of this action, together with all expert witness

fees, attorneys' fees, and court costs, as fully as is allowed by law;

6. That a trial by jury be held on all issues; and

7. That the United States Government, and the Relator Howard, receive all relief, both in law and in equity, to which they may reasonably appear entitled.

**[SIGNATURE OF COUNSEL FOLLOWS ON NEXT PAGE]**

This the 27th day of July, 2012.

Respectfully Submitted,

Charles H. Rabon, Jr.
N.C. State Bar No. 16800
CLTAtty@gmail.com
Rabon Law Firm, PLLC
1616 Cleveland Avenue
Charlotte, NC 28203
Tel. 704-375-1800
Fax 704-347-0684
Attorneys for Plaintiff

OF COUNSEL:

Joel Androphy
Texas State Bar No. 01254700
JAndrophy@bafirm.com
Sarah M. Frazier
Texas Bar No. 24027320
SFrazier@bafirm.com
Rachel L. Grier
Texas Bar No. 24055592
RGrier@bafirm.com
Berg & Androphy
3704 Travis Street
Houston, Texas 77002-9550
Tel.713-529-5622; Fax 713-529-3785

Matt Abbott
Alabama Bar No. AASB-3107-P70A
matt@abbottfirm.com
Abbott Law Firm, LLC
308 Martin Street North
Suite 200
Pell City, AL 35125-1727
Tel. 205-338-7800; Fax 205-338-7816

37